Me √

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
REAL ESTATE
DOCKET NO. RE-11-0183
JAW-CUM - 11/9 2012

STEPHEN WELSH,

  Plaintiff

v.

SEBAGO GRAVEL PIT, LLC

  Defendant

**DECISION AND ORDER**

SEBAGO GRAVEL PIT, LLC

  Counterclaim Plaintiff

v.

STEPHEN WELSH,

  Counterclaim Defendant



STATE OF MAINE
Cumberland ss. Clerk's Office

NOV 09 2012

RECEIVED

## INTRODUCTION

This case involves a series of deals among three unsophisticated businessmen. The dispute began when two of the businessmen, Joe Brown ("Brown") and Michael Haskell ("Haskell"), faced the threat of the loss of their business. Brown and Haskell owned and operated Sebago Gravel Pit, LLC ("Sebago"), and Hasbro Excavation Contractors, Inc. ("Hasbro"). They asked Stephen Welsh ("Welsh"), a realtor with whom they had done some business in the past, to loan them money to pay off a lender (Pioneer Capital), who was foreclosing on land they owned, and to pay off the financing on an excavator. On or about September 25, 2008, Brown and Haskell signed, in their individual and corporate capacity, including on behalf of Sebago and Hasbro, a

1

commercial promissory note, Plt's 1 (the "Note" or "Note Debt"), in favor of Welsh in the amount of $150,000, calling for payment of "all outstanding principle and accrued interest" in six months. Plt's 1, § 2. The Note was due in full and payable on March 25, 2009. Also, on September 25, 2008, Brown and Haskell, as "managing partners" of Sebago gave a mortgage deed and financing statement (the "Mortgage") in favor of Welsh. Plt's 2. They also gave Welsh mortgages on each of the borrowers' properties in Lewiston, Baldwin (two parcels), Standish, Cornish, Sebago and Denmark, Maine. Plt's 1, §12. As part of this deal Brown executed a mortgage deed and financing statement to his residence in Denmark, Maine. Plt's 5.

Brown and Haskell paid $8,217 up front as carrying costs for Welsh's home equity loan due during the pendency of the six months of the Note. To finance the $150,000, Welsh obtained a home equity loan for which he paid approximately $1,360 each month for carrying the home equity home. After paying the initial carrying costs, Brown and Haskell made one payment of $1,360 before March 25, 2009. Brown and Haskell failed to pay by March 25, 2009 "all outstanding principal and accrued interest" due under the Note.[1]

Welsh filed this action claiming that Sebago breached the Note and seeking foreclosure of the mortgage and an order of sale of the premises of Sebago Gravel Pit, which had been given as security for payment of the Note. Sebago countered that the Note is fully satisfied and in addition, Welsh committed fraud and forgery, which conduct should waive any balance due under the Note. Sebago filed a "Counterclaim"

---

[1] The parties disagree about how sums paid should be applied to the Note Debt; however, Welsh had absolute discretion under Section 3.2 of the Note in determining how to apply payments to the Note Debt.

2

claiming breach of contract (Count I), conversion (Count II), trespass to chattels (Count III), replevin (Count IV), quantum meruit (Count V), and unjust enrichment (Count VI). Counterclaim plaintiffs include Sebago Gravel Pit, LLC, Hasbro Excavation Contractors, LLC, Joe Brown and Mike Haskell. They allege Welsh wrongfully repossessed and sold a dump truck and wrongfully retained an excavator. Further they allege when he accepted a deed in lieu of foreclosure on the Denmark property, Welsh agreed to sell the property in a commercially reasonable manner, which he failed to do when he sold the property without consulting or informing any of the makers of the Note. Finally, the counterclaim plaintiffs allege Welsh forged Haskell's name on the bill of sale for the dump truck.

At the outset and in finding the facts in both the Introduction and the Discussion sections of this Decision and Order, the Court finds Welsh's testimony quite credible and the testimony of Haskell and Brown incredible in ways that will be explained below.

## DISCUSSION

### A. Real Estate

In addition to the facts recited by the court in the introduction, the Court makes the following findings of facts and conclusions of law. Contrary to defendants' claim, the court finds that Welsh was not acting as a fiduciary for any of the counterclaim plaintiffs with respect to any of the transactions implicated in this action.

In order to loan the money to Brown and Haskell, Welsh borrowed the money in the form of a home equity loan, which was payable by Welsh in monthly increments of approximately $1,360. Brown and Haskell understood that Welsh had this obligation and they agreed to pay Welsh's carrying costs related to the home equity loan so that the

3

Bank would not foreclose on Welsh's home. At the outset, Brown and Haskell paid Welsh $8,217. After payment of the initial sums, Brown and Haskell made thirteen (13) payments of $1,360 to Welsh to continue to cover his monthly carrying costs of his home equity loan. Brown and Haskell paid by check $25,000 in May 2009 and $17,000 in June 2009 with the notation "second payment" in the memo section of the second check. The court concludes that these two payments were payments on the Note Debt.

The Note contained no interest provision; nor did it include a monthly payment schedule. There is a single payment specified of "one final installment equal to the balance of principal and any other applicable charges on the sixth month (6th) anniversary of the date of this note (the "Maturity Date")." Plt's 1, §3.1. The Note further specified: "All payments made hereunder will be applied, *in Lender's sole discretion*, first to costs of collection, second to penalties, third to interest accrued and the balance, if any, to principal." Plt's 1, §3.2 (emphasis supplied). The Note provides that if any installment is not received within 10 days of when due, "a late payment fee of 7% of the amount of such delinquent installment, to be assessed at the option of the holder hereof at any time while any balance remains outstanding hereunder." Plt's 1, §4. The Note also provides a default interest rate of 5% per annum, which shall accrue and be payable until actual payment and satisfaction of all amount due under the Note. Plt's 1, §4A.

With the exception of the initial payment of $8,217 and the March 3, 2009 payment of $1,360, all other payments were made after the Maturity Date of March 25, 2009. Welsh notated all payments received in a ledger. Plt's 28A. Initially, he allocated primarily the payments towards interest. By October 2009, Welsh began allocating

4

payments between interest and principal in accordance with the allocation used by his home equity lender and those allocations appear on the ledger. Plt's 28A.

The court finds that although there was a written agreement between the parties with regard to the $150,000 that was borrowed, the parties had a separate oral agreement by which Brown and Haskell would pay $8,217 up front for Welsh's six months of carrying costs on his home equity loan during the term of the Note. Thereafter, Brown and Haskell were to continue to pay Welsh $1,360 each month to cover Welsh's home equity loan until the Note was paid in full. Under the oral agreement, Welsh was also to get a lot out of the Baldwin subdivision. Brown and Haskell never transferred the Baldwin property to Welsh and did not make any more payments after April 1, 2010.

On September 29, 2009, Welsh made a demand through his attorney, stating, "[a]s of September 1, 2009, $100,000 in principal was owed on the Note." Plt's 6. Welsh advised Brown and Haskell that if the Note is not paid immediately, he would bring a lawsuit and foreclosure on the mortgages and security interests securing the Note.

In February 2010, Welsh commenced foreclosure on Brown's Denmark, Maine residence. Brown knew based on conversations with his attorney that he had no defense to the foreclosure and Brown had in fact been defaulted on the foreclosure. Plt's 8. On April 28, 2010, Brown executed an Agreement Pertaining to Deed in Lieu of Foreclosure ("Deed In Lieu Agreement"), Plt's 9, under which Brown conveyed by deed in lieu of foreclosure Brown's property interest in a piece of real estate located in Denmark, Maine. The Deed in Lieu Agreement obligated Welsh to "proceed in a commercially reasonable manner to sell the Property and upon such sale the proceeds shall be applied, first to the costs of the sale, and second to the payment of legal fees and costs reasonably incurred

5

by Welsh in connection with efforts to collect upon the Note, including, without limitation, the legal fees and costs reasonably incurred by Welsh in connection with the foreclosure of the Mortgage." Deed in Lieu Agreement, Plt's 9, ¶ II(F).

Sale of the Denmark property did not satisfy the existing indebtedness to Welsh. Brown hoped that the liquidation would produce sufficient profit to erase the indebtedness to Welsh, but Brown understood that if the liquidation did not produce enough money to satisfy the existing indebtedness due to Welsh, then Brown and Haskell would owe him the deficiency. Plt's 8.

The court finds that Welsh sold the Denmark property in a commercially reasonable manner for its fair market value of $55,000. The parties disagree about the value of the Denmark property. Brown contends that the camp's fair market value was between $100,000 and $115,000. The court rejects Brown's valuation. Welsh sold the property for $55,000, which he testified was the best offer made on the property because of its condition. Welsh also submitted a contract for the sale of the property, in which Brown agreed to sell the property for $55,000 to the Watermans before he conveyed the property to Welsh. Plt's 12. Notwithstanding Brown's claim that he does not remember signing the Waterman contract and that it is not his wife's signature on the contract, the court finds that in March of 2010, Brown was willing to sell the property to a third-party for $55,000 and that he sent on March 23, 2010 the signed contract through his own home fax machine. Further, the court bases its conclusion on the fair market value on a comparison with the sale price of $67,000 of a neighbor's property that has water rights and could be subdivided into 3 lots. Consequently, the court disbelieves Brown's

6

testimony concerning the value of the Denmark property and rejects Brown's argument that the Denmark property was not sold in a commercially reasonable manner.

According to the HUD Settlement Statement in Welsh's sale of the Denmark property, cash due to the seller, after subtracting all costs of sale, was $51,411. Plt's 16. Notwithstanding the discretion given to Welsh in II(F) of the Deed in Lieu Agreement, Welsh credited Brown with the full amount of $51,411 towards the debt owed on the Note.

The Court rejects defendant's or counterclaimant plaintiffs' argument that foreclosure law applies to the sale of the Denmark property. The property was not sold pursuant to a foreclosure but pursuant to the Deed in Lieu Agreement, which required the sale be in a commercially reasonable manner. As discussed in the foregoing, the court finds that Welsh sold the Denmark property in a commercially reasonable manner in accordance with the governing agreement.

**B. Equipment**

The parties' dispute also relates to the sale of a 1995 Ford LTL900 Dump Truck, Black, VIN Number 1FDZA90X1SVA14514, and the taking of a Hitachi Lindy V Excavator 200 having serial number 14HP089823. Defendant argues that the Mortgage did not authorize the sale of equipment such as the dump truck and the excavator. Defendant is correct. But the Collateral Agreement With Regard to Disposition of Collateral (the "Collateral Agreement"), Plt's 20 and 31,[2] authorizes Welsh to sell the truck and excavator. The parties executed the Collateral Agreement on April 28, 2010, the same day that Brown signed the Agreement Pertaining to Deed in Lieu of Foreclosure

---

[2] Plaintiff's 31 is the same as Plt's 20, but it is the original Agreement with a signature for both Brown and Haskell.

7

and the Deed in Lieu of Foreclosure. See Plt's 9 and 10. Haskell denied he signed this Agreement.

The court rejects Haskell's argument that he did not sign the agreement. Haskell knew early in the business deal that Welsh wanted the dump truck and excavator as collateral. Haskell admits that at the last minute on the date of the closing on the $150,000 loan, Brown told him that Welsh wanted the dump truck and excavator as collateral for the loan. Haskell said they were left with no choice because at the last minute Welsh wanted additional security for the loan. Haskell does not dispute a collateral agreement existed but said he was not in favor of the collateral agreement. Additionally, there is no evidence that Welsh signed the agreement for either Brown or Haskell. It is possible for reasons stated below that Brown signed Haskell's name to the agreement, but there is no evidence to support this.

The Collateral Agreement, signed by all of the parties, gave Welsh the sole discretion to decide the terms of the sale of the truck and excavator, including the prices paid for the two vehicles. The Collateral Agreement provided that net sale proceeds were to be applied to reduce the Note Debt.

On October 2, 2008, the same day as the execution of the Commercial Property Note and the various mortgage deeds, a UCC Financing Statement in connection with the dump truck and the excavator was filed. The UCC-1 discloses that the debtor is Hasbro Excavation Contractors and the secured party is Stephen Welsh. Plt's 17. The Certificate of Title for the Ford dump truck was issued July 28, 2005 in Hasbro's name, but on September 10, 2010, a new certificate of title was issued disclosing an additional owner of Joseph Brown and a lienholder of Stephen Welsh. Plt's 18.

8

Pursuant to the Collateral Agreement, Welsh attempted without success to sell the Ford Dump Truck in the mid $20,000s. Ultimately, in August 2010, Welsh sold the dump truck to a Scott Ferland for $13,000. Haskell signed the Bill of Sale. Haskell denies signing the Bill of Sale or the back of Title in August 2010. Contrary to Welsh's testimony, Haskell testified that he only had one conversation with Welsh and that Welsh was angry at Brown because he would not answer his phone and Welsh needed to get something signed but Haskell didn't know exactly what it was.

Notwithstanding Haskell's denial of signing the Bill of Sale, the court finds that Welsh's testimony concerning the circumstances of Haskell's signing the documents is very specific and credible. The UCC Financial Statement discloses that as of October 2, 2008 Haskell was the owner of the excavator and dump truck and Stephen Welsh was the secured party. Plt's 17. Welsh testified that Brown told him to get Haskell's signature because Haskell was closer. According to Welsh, he spoke with Haskell on the phone and Haskell said, "Come down and get it signed." [3] Welsh's phone records confirm that he had two conversations with Haskell, one for as long as five minutes on August 12, 2010, the date of the sale. Plt's 29. The court rejects Haskell's testimony that he knew nothing about the sale and that Welsh forged his name.

Haskell testified that he and Brown had not been getting along for several years and at this time there was a skidder issue between Brown and him. According to Haskell, Brown sold the skidder without Haskell's permission and that Brown wrote a bill of sale to a third party and never showed the Bill of Sale to Haskell. It may be that in the case at

---

[3] Also according to Welsh, Brown agreed to get Title so Welsh could sell the equipment. Brown twice ordered the Title before the Title correctly included Welsh's name. Plt's 18, Def's 26A. Welsh held up the sale until Brown got the Title cleared.

hand, Brown signed Haskell's name on some of the documents, which he never showed to Haskell, but the record is devoid of any evidence on this issue. In the absence of such evidence, the court finds that Haskell signed the bill of sale for the Ford Dump Truck.[4]

Welsh attempted to sell the excavator in the mid $20,000s. Even though he found potential buyers in the $20,000-$24,000 range, Brown and Haskell would not cooperate and a sale of the excavator never occurred. The excavator sits on Welsh's property in Poland. Notwithstanding Brown and Haskell's claim that they never gave Welsh permission to take or to sell the dump truck and excavator, the court finds that the Collateral Agreement gave Welsh specific authority with respect to the dump truck and excavator. The Collateral Agreement required Brown and Haskell to immediately deliver the vehicles and any related documents to Welsh, authorized Welsh to sell the vehicles, and to apply the net proceeds to the Note Debt. In short, Welsh retained sole discretion in selling this property.

In accordance with Section 3.2 of the Note, Welsh calculated costs of collection, penalties and interest accrued, and then applied the balance of the debt principal to arrive at a total debt owed of $56,011.71. Plt's 28. The Court concludes that judgment should enter for Welsh in this amount. With respect to the counterclaim, even if the counterclaim plaintiffs could file a counterclaim, it should be plainly clear by now that they cannot prove their claims by a preponderance of the evidence.

The entry is:

Judgment of Foreclosure for the plaintiff.

---

[4] Brown and particularly Haskell claim that Welsh forged a number of documents; however, they offer no evidence to support this claim. The court found Welsh to be a credible witness and that Brown and Haskell were incredible.

10

Judgment to Plaintiff in the amount of $56,011.71, plus attorney's fees and costs.

Judgment for Plaintiff on all counts of Counterclaim.

Date:   November 8, 2012

Joyce A. Wheeler, Justice
Maine Superior Court

Plaintiff's Attorney-Daniel Felkel Esq
Defendant's Attorney-John Campbell Esq

11

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
REAL ESTATE
DOCKET NO. RE-11-0183
JAW – Cum – 1/3/2013

STEPHEN WELSH,

    Plaintiff

v.

SEBAGO GRAVEL PIT, LLC

    Defendant

**ORDER**

SEBAGO GRAVEL PIT, LLC

    Counterclaim Plaintiff

v.

STEPHEN WELSH,

    Counterclaim Defendant

STATE OF MAINE
Cumberland, ss, Clerk's Office

JAN 03 2013

RECEIVED

Following the court's entry on November 9, 2012 that a judgment of foreclosure in the amount of $56,011.71 plus attorney's fees and costs, Welsh filed a motion for entry of foreclosure judgment. The defendants opposed the motion on several grounds, not all of which are worthy of addressing. However, there is some merit as discussed below in defendants' opposition.

First, plaintiff's citing to portions of the complaint to support a statement of material fact generally would fail. *See HSBC Bank USA, N.A. v. Gabay*, 2011 ME 101, ¶ 2 n. 2. However, the court's Decision and Order, entered November 9, 2012, found that Welsh was in possession of the note and mortgage and that the defendants breached a condition of the note when they failed to pay it in six months. The court also found the

1

amount due on the mortgage note. The court, however, did not find the amount of reasonable attorney's fees or the order and amount of any priorities as these matters were not addressed by the evidence at trial. Since plaintiff did not adduce evidence at trial on these matters, plaintiff must resort to the measures approved for summary judgment, including a statement of material facts.

The Maine Law Court is quite clear that a statement of material facts must include "the order of priority and any amounts that may be due to other parties in interest, including any public utility." *Id.* at ¶ 23. Similarly, a mortgage holder's statement of material facts must include "the amount due on the mortgage note, including any reasonable attorney fees and court costs." *Id.* at ¶ 26. Therefore, Welsh must specify what his fees and costs are.

The entry is:

Plaintiff has fourteen (14) days to file a statement of material facts with respect to these factors, and a corrected proposed foreclosure judgment. Defendants have ten (10) days to file any opposing statement of material facts.


Date:   January 3, 2013

Joyce A. Wheeler, Justice
Maine Superior Court



PA=Daniel Felkel Esq
DA=John Campbell Esq



2